Clarence **STEINBERG** and Leo Weigant

v.

**Wilson H. ELKINS, President, University of Maryland (In his official and personal capacities).**

Civ. No. B–75–307.

United States District Court,
D. Maryland.

April 30, 1979.

---

Phyllis J. Erlich, Baltimore, Md., Kenneth A. Letzler, James W. Jones, and Arnold & Porter, Washington, D. C., for plaintiffs.

Stephen H. Sachs, Atty. Gen. of Maryland, Mary Elizabeth Kurz and Michael W. Lower, Asst. Attys. Gen., Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

Plaintiffs Steinberg and Weigant, formerly English professors at the University of Maryland, have filed this complaint alleging that they were denied procedural due process when the University terminated their employment without hearings. The case is now before the court on motions of the defendant for summary judgment and to dismiss and on plaintiffs' motions to compel production of certain documents.

Whether the plaintiffs were entitled to due process protection depends on whether they enjoyed a "legitimate claim of entitlement" to their positions sufficient to bring their expectation of re-employment to the level of a property interest safeguarded by the Fourteenth Amendment. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The plaintiffs assert that they had been awarded "tenure," and therefore had a protectable prop-

erty interest; the University contends that under the very terms of their employment contracts, neither plaintiff had "tenure." The defendant has moved to dismiss on the ground that this court lacks jurisdiction since the case presents merely a contract controversy between non-diverse parties and has moved in the alternative for summary judgment on the ground that the plaintiffs had no tenure and therefore no protected property interest in continued employment.

### The Facts

The essential facts are as follows. Plaintiff Steinberg joined the English Department at the University of Maryland's College Park campus at the beginning of the 1968–69 academic year. He came to the University having taught full-time elsewhere since 1960. Since he had not earned his Ph.D. by September 1, 1968, his initial appointment was as a lecturer. With the subsequent receipt of the Ph.D., he was promoted to the rank of Assistant Professor beginning in September 1969.

Plaintiff Weigant also began serving as an Assistant Professor in September 1969. He came to the University of Maryland with a Ph.D. and had taught full-time at another university from 1963–1966.

Both plaintiffs' initial employment contracts specified that

full-time appointments to the rank of assistant professor shall be for an initial term of three years, which appointment may be renewed for an additional three-year term. The first year of the initial three-year term shall be a probationary year, and this Agreement may be terminated at the end of that fiscal year if the APPOINTEE is so notified by April 1. The APPOINTEE shall be notified at least one year in advance of the expiration of any three-year term if it is the intention of THE UNIVERSITY not to renew the appointment. . . . A

full-time APPOINTEE to the rank of assistant professor who shall have completed six continuous years of service at the UNIVERSITY in that rank shall acquire permanent tenure, and thereafter his appointment may be terminated [only by resignation or death or—with provision for a hearing—for immorality, misconduct, incompetency or wilful neglect of duty, or in specified cases of fiscal difficulty.]

It is alleged[1] that during the 1960's the great majority of assistant professors at the University of Maryland achieved tenure. Although the government of the University is vested by law in the Board of Regents and the Board is charged with responsibility for establishing tenure policy, the decision whether to grant tenure generally rested with the professor's department. The department forwarded its recommendations to the administration which routinely approved them, and signalled its approval by silence.

During the time in question, the American Association of University Professors (hereinafter AAUP) had promulgated guidelines for tenure which specified that up to three years of prior full-time teaching experience at another institution should be credited toward the pre-tenure probationary period at the University of Maryland. Thus, under the AAUP guidelines, a professor with at least three years' previous teaching experience at another university would be considered for tenure at the latest at the end of his third year at the University of Maryland rather than at the completion of his sixth year. The English department, and perhaps other departments as well, followed the AAUP guidelines and considered prior service in making tenure decisions/recommendations. The then chairman of the English department, Professor Freedman, stated that he had reason to believe that the University administra-

---

1. These allegations are culled largely from the detailed statement of facts set out in the plaintiffs' response to the defendant's motion for partial summary judgment. Court Paper 43 at 5–21. The defendant has indicated that for the purpose of its motion for summary judgment, it accepts plaintiffs' statement. Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment, Court Paper 90 at 1.

tion recognized and acquiesced in the AAUP guidelines.[2]

With this understanding, the English department resolved to consider more critically the decision whether to terminate or continue a professor after his third year. Freedman Affidavit at 4. This was because a professor with full-time experience elsewhere could, upon renewal of his initial three-year appointment, accede to "de facto" tenure under the AAUP rule.

Accordingly, in March of 1970, during the second year of plaintiff Steinberg's employment at the University, but his first year as assistant professor, the English department voted to award him the second three-year contract. In consideration of his prior three-year teaching experience elsewhere, it was understood by the department members, including Steinberg, that the contract renewal "carried" tenure with it. The plaintiff was congratulated and, relying on the understanding that he had tenure, made certain personal and professional commitments he might not otherwise have made.

The department's decision does not appear to have been communicated unambiguously to the administration at this time. The Chairman informed the Dean of the College of Arts & Sciences that Steinberg's three-year contract had been renewed, but did not directly indicate his alleged understanding that the renewal constituted an award of tenure. Over two years later, however, in November 1972, the faculty of the English department again voted—this time explicitly—to award Steinberg tenure. This was during plaintiff's fourth year at the University, his third in the rank of assistant professor, and his seventh year of teaching under the AAUP rule. This decision was communicated to the Dean.

Similarly, the English department considered plaintiff Weigant for tenure during his second year at the University (his fifth year of full-time teaching experience) but decided to defer the decision on Weigant for another year. This was, apparently, permissible under AAUP procedures, but the University contract required that unless Weigant's initial three-year appointment were terminated prior to the end of the third year at the University of Maryland, it would be renewed automatically. Under the AAUP guidelines, the automatic three-year renewal would also "carry" tenure for Weigant. To avoid this possibility that plaintiff Weigant might slip into tenure by default, the chairman of the English department terminated Weigant's contract effective at the end of his third year at the University, and notified him that he would "come up" for tenure during that year (his third at the University of Maryland, his sixth of full-time teaching). In the event tenure was denied, Weigant was to be granted an additional one-year appointment. Apparently this procedure was cleared with the Dean of the College of Arts & Sciences. Freedman Affidavit at 9.

The English department voted tenure for Professor Weigant on March 24, 1972, during his third year of service at the University, and communicated its decision to the administration. Weigant, like Steinberg, accepted the congratulations of his colleagues and altered personal and professional priorities in reliance on his "tenured" status.

The University administration took no action on these 1972 tenure "awards," and both Steinberg and Weigant assumed that there was no problem. In October 1973,

**2.** Professor Freedman's affidavit is attached to plaintiffs' response to defendant's motion for partial summary judgment, Court Paper 43. Specifically, he describes an incident during 1967 in which the English department sought to terminate an instructor, one Buhlig, who was then in his sixth year at the University. The professor, with the support of the AAUP, resisted dismissal, claiming that, under AAUP guidelines, he had already "slipped into" tenured status by virtue of a previous year of full-time teaching experience elsewhere. Confronted by the conflict between the AAUP and the contractual tenure policy, the administration recommended that the professor in question *not* be terminated, and offered to ease the department's budgetary consequences. As a result of this incident, the English department decided to follow the AAUP guidelines and give consideration to prior service elsewhere in making its tenure determinations. Freedman Affidavit at 2–4.

however, nearly a year after Steinberg's "tenure decision" and a year and a half after Weigant had been told he had tenure, Dean Aylward wrote to the new chairman of the English department, Dr. Kenney, stating that the plaintiffs "should be formally reviewed" during the 1973–74 academic year. He indicated that the administration had taken no action on either Steinberg or Weigant before then because the English department had not forwarded to the administration any supporting documentation.

Dr. Kenney informed Dr. Weigant that in the eyes of the administration he apparently did not have tenure. The English department quickly voted to reaffirm its earlier decisions on both Steinberg and Weigant and notified the administration of its favorable action in late 1973. The administration denied tenure to both Steinberg and Weigant. The English department unsuccessfully petitioned the administration to reverse its decision. The plaintiffs were terminated at the end of the 1974–75 school year and this lawsuit followed.

### The Motion to Dismiss

■ The defendant asserts under Fed.R. Civ.P. 12(h)(3) that this court lacks jurisdiction over the subject matter of the case since the only question is one of state contract law, not one of federal law as required by 28 U.S.C. § 1331.[3] The defendant's argument is two-pronged: first, he contends that the plaintiffs' claim is not one of denial of procedural due process but rather a challenge to the substance of the University's decision that they did not have tenure. The defendant's second contention is that the property interests asserted by the plaintiffs arose solely under the terms of their employment contracts. Therefore, the defendant argues that the essence of the plaintiffs' case is simply that they were denied rights due them under their contracts with the defendant. Such a claim clearly would

pose no federal question, *Heath v. City of Fairfax*, 542 F.2d 1236, 1238 (4th Cir. 1976), since "[e]very disagreement between a public employee with his employer over matters of State law or the terms of his contract does not reach constitutional proportions," *Sigmon v. Poe*, 564 F.2d 1093, 1096 (4th Cir. 1977).

This argument misconceives the nature of the plaintiffs' claim. Their complaint is not that the University breached its contracts with them, but that each of them had an expectation of continued employment (i. e., "tenure") which arose not from the terms of the contract but from other circumstances surrounding their service as professors. This expectation was, the plaintiffs assert, of sufficient magnitude that the state could not dispossess them of it without due process of law. In *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a discharged teacher successfully asserted that he had a property interest in continued employment which arose not from a formal contract but from a *de facto* tenure understanding. The Court stated:

A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient "cause" is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a "property" interest in re-employment. . . . Explicit contractual provisions may be supplemented by other agreements implied from "the promisor's words and conduct in the light of the surrounding circumstances." . . .

A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure. Just

---

3. Although only declaratory and injunctive relief is sought, this court is satisfied that the case meets the jurisdictional amount in controversy required by 28 U.S.C. § 1331. *See Friedman v. Int'l Ass'n of Machinists*, 95 U.S.App.

D.C. 128, 220 F.2d 808, 810, *cert. denied*, 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736 (1955); *White v. Bloomberg*, 345 F.Supp. 133, 141 (D.Md.1972), *aff'd*, 501 F.2d 1379 (4th Cir. 1974).

as this Court has found there to be a "common law of a particular industry or of a particular plant" . . ., so there may be an unwritten "common law" in a particular university that certain employees shall have the equivalent of tenure. *Perry v. Sindermann, supra* at 601–02, 92 S.Ct. at 2699–2700 (citations omitted).

The plaintiffs in this case have asserted that they enjoyed just such *de facto* tenure, based upon representations they received from the authorities in the English department. While this case differs significantly from *Perry v. Sindermann, supra,* in that Sindermann's contract was silent on the issue of tenure while the Maryland contract purports to set forth the exclusive means of achieving tenure, this court is not prepared to hold as a matter of law that, at the University of Maryland, no form of common-law or *de facto* tenure existed during the time in question.

There is authority for the defendant's proposition that no common-law tenure may coexist alongside a specific, statutory tenure system, *e. g., Ryan v. Aurora City Board of Education,* 540 F.2d 222, 227 (6th Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Toney v. Reagan,* 326 F.Supp. 1093, 1096 (N.D.Cal. 1971), *aff'd in part, dismissed in part on other grounds,* 467 F.2d 953 (9th Cir. 1972), *cert. denied sub nom. Mabey v. Reagan,* 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973). Nevertheless, the first tenure case in this circuit to be decided after *Perry v. Sindermann, supra,* and its companion, *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), at least suggests that the existence of formal tenure policy does not preclude the acquisition of tenure through a less formal means. The court found that although the discharged teacher did not satis-

fy a newly-enacted tenure provision in her contract, she had nonetheless stated a cause of action under the Fourteenth Amendment. *Johnson v. Fraley,* 470 F.2d 179, 183 (4th Cir. 1972).[4] Thus, the law in this circuit appears to be that the existence of explicit contractual provisions governing tenure does not necessarily negate the existence of a legitimate extracontractual expectation of continued employment. *See also Thomas v. Ward,* 529 F.2d 916, 919 (4th Cir. 1975); *accord Soni v. Board of Trustees of the University of Tennessee,* 513 F.2d 347, 351 (6th Cir. 1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976).

The question whether, under the circumstances in this case, the plaintiffs actually enjoyed such unwritten property rights is yet to be decided. It is clear, nevertheless, that the case raises a federal question of sufficient magnitude to permit this court to exercise its jurisdiction under 28 U.S.C. § 1331. Accordingly, the defendant's motion to dismiss will be denied.

### The Motion for Summary Judgment[5]

The defendant has moved for summary judgment asserting that (1) the material facts are not in dispute and (2) as a matter of law, the plaintiffs did not have a legitimate claim of entitlement to continued employment since the extent of their "property interest" was governed strictly by Board of Regents policy. The defendant asserts in the alternative that even if the plaintiffs were entitled to look beyond the four corners of their contracts, they have not established the reasonableness of their expectation. This court will deny the motion for the reason that the plaintiffs are entitled to trial on the issue of the reasonableness of their expectation of re-employment in light of all the circumstances.

---

**4.** It is not clear whether the Fourth Circuit found that the teacher had a "property" or a "liberty" interest in continued employment. *See* Senior Judge Boreman's special concurrence at 470 F.2d 183.

**5.** The defendant originally filed a motion for partial summary judgment in November 1976. Court Paper 38. When plaintiff Steinberg

dropped his claim for relief under the first amendment, and after a conference with the court, the defendant resubmitted his motion, casting it as a motion for summary judgment. Court Paper 90. Since the issues raised by both motions are the same, the court will treat them together.

This court rejects the defendant's view that, as a matter of law, the plaintiffs' employment expectations were governed solely by their contracts and that no *de facto* tenure could exist concurrent with the contractual provisions. The defendant correctly points out that property interests, unlike liberty interests, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). *See also Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976): "A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." (Footnotes omitted). This does not mean, however, that the state, in this case the University, has the unilateral power to decree what interests do and what do not as a matter of law warrant protection by the Constitution. For "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) (citations omitted).

Federal constitutional principles require that the court assess the reasonableness of the plaintiff's employment expectations in light of the surrounding circumstances. *Perry v. Sindermann*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). As the Fourth Circuit stated in *Thomas v. Ward*, 529 F.2d 916, 919 (4th Cir. 1975),

> Thus, explicit contractual provisions may be supplemented by other agreements implied from the promisor's words and conduct in light of the surrounding circumstances. And, a teacher who has held his position for a number of years might be able to show that he has a legitimate claim of entitlement to job tenure.

*See also Johnson v. Fraley*, 470 F.2d 179, 181 (4th Cir. 1972). Accordingly, this court must reject the defendant's assertion that as a matter of law the plaintiffs' tenure expectations were governed solely by the wording of their contracts.

The defendant contends further that even if, as the court has held, the plaintiffs are allowed to prove common-law tenure by reference outside their employment contracts, they still have not shown that they had a reasonable expectation of re-employment, and summary judgment should be entered for the University. The court does not agree. While it is unquestionably true that a mere subjective expectancy or an abstract need for employment is not a property interest protected by the due process clause, the plaintiffs here have demonstrated something more than that.

It is well settled that summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances. Neither should summary judgment be granted if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions. *Phoenix Savings and Loan, Inc. v. The Aetna Casualty and Surety Company*, 381 F.2d 245, 249 (4th Cir. 1967). Summary judgment should be granted only where it is not only perfectly clear that no material issue of fact is involved but also clear that there is no disagreement as to the inferences which may be drawn from the undisputed facts. *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert. denied*, 342 U.S. 887–88, 72 S.Ct. 178, 96 L.Ed. 666 (1951). The party opposing the motion for summary judgment is entitled to all favorable inferences which might be drawn from the facts. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Cram v. Sun Insurance Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967).

Accordingly, in this case, where there is sharp disagreement as to the infer-

ences to be drawn from the fact of the English department's having voted tenure for the two plaintiffs, summary judgment for the defendant would not be appropriate, and the defendant's motion will be denied.

### Discovery Motions

The plaintiffs have moved to compel production of supplementary documentation relating to some 48 individuals previously named by the defendant in his response to Interrogatory 9. *See* Court Papers 79, 81. The defendant has objected that this material is irrelevant, that production would be burdensome and that the motion is untimely. The court sees no merit to the defendant's contentions and, accordingly, will grant the motion.

■ The information sought relates to the achievement of tenure by other professors at the University of Maryland. Specifically, the plaintiffs seek all documents relating to hiring, promotion and tenure decisions, notification thereof, and prior full-time teaching experience elsewhere for each of the 48 individuals identified. Clearly, this information is relevant to the issue whether there existed, during the time in question, common-law tenure.

Although the defendant surely will not welcome the task of searching his files a second time for information which might have been produced originally, this court does not find this to be unduly burdensome. As contemplated by the federal rules, the plaintiffs took advantage of the device of interrogatories to narrow the scope of their need for documents. *See* 4A *Moore's Federal Practice* ¶ 33.22 at 33–114:

> The use of interrogatories under the "existence, description, etc." phrase of Rule 33 is of great importance, it can be seen, in the operation of Rules 34 and 45, for it is under Rule 33 that the party discovers what it is that he should seek *under Rule 34. . . .*

It is completely appropriate for the plaintiffs to seek production of "backup" documents, the existence of which was revealed by its earlier interrogatories.

The defendant's assertion that the motion is untimely is unpersuasive. It is regrettable that no firm schedule has controlled the progress of this case, and that discovery has been long suspended by the pendency of the various motions on the merits. Nevertheless, there appears to be little justification for denying the plaintiffs' motion on the ground of untimeliness. The interrogatory from which the sought documents spring, Interrogatory 9, lay unanswered for nearly a year after it was served. The plaintiffs began seeking these documents promptly after the defendant answered Interrogatory 9. Under these circumstances, the court can hardly find the plaintiffs' motion untimely.

Accordingly, the plaintiffs' motion to compel production of all supporting documents for each of the 48 individuals identified in the appendix to the plaintiffs' request, Court Paper 79, will be granted.

■ The plaintiffs further seek production of "[a]ll documents which relate or refer in any way to the tenured status or lack thereof" of Dr. Evelyn Barker, a member of the Philosophy department at the University's Baltimore County campus. According to the plaintiffs, Professor Barker obtained tenure under circumstances remarkably similar to those in this case. They seek to prove by way of the documents sought that common-law tenure was, at least on occasion, honored by the University administration.

The defendant resists the motion asserting that the request is irrelevant, overbroad, annoying, harassing, and that the documents are privileged. Leaving aside for the moment the question of privilege, the court is not inclined to agree with the defendant.

*Perry v. Sindermann,* 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972), held that one asserting a right of *de facto* tenure "must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.'" Insofar as any actions taken by the University toward Professor Barker might throw light on the

"policies and practices of the institution," they are relevant within the meaning of Fed.R.Civ.P. 26(b)(1) and hence discoverable. Given the defendant's assertion that tenure policy and decisions rested solely with the Board of Regents and the University administration, it would seem of little significance that Professor Barker was in a different department on a different campus. Of course, this court expresses no opinion at this time as to the admissibility of records of "the Barker case" at trial.

The court further is not persuaded by any showing of the defendant that the plaintiffs' request is "overbroad" or "harassing."

Therefore, with the exception of those documents as to which privilege may validly be asserted,[6] the plaintiffs' motion for production of all documents concerning the tenured or non-tenured status of Dr. Evelyn Barker will be granted.

Accordingly, it is this 30th day of April, 1979, by the United States District Court for the District of Maryland, ORDERED:

(1) That the defendant's motion to dismiss for want of subject matter jurisdiction be, and the same hereby is, DENIED;

(2) That the defendant's motions for partial summary judgment and for summary judgment[7] be, and the same hereby are, DENIED; and

(3) That both of the plaintiffs' motions to compel production of documents be, and the same hereby are, GRANTED.

---

**6.** The parties have apparently agreed that the matter of privilege may be resolved by the defendant's furnishing a list of documents as to which privilege is claimed, indicating author, addressee, date, subject and particular privilege asserted. It is hoped that this procedure will obviate the need for any further intervention by this court into discovery matters.

**7.** *See* footnote 5, *supra.*