**FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, et al.**

v.

**Gerard A. HEIDRICK, Jr., et al.**

**Civ. No. HM–86–77.**

United States District Court, D. Maryland.

Jan. 25, 1991.

---

Paul E. Gutermann and James Flannery, Washington, D.C., for plaintiffs.

William H. Morstein, Ellicott City, Md., James E. Gray, Thomas V. Monahan, Jr., Baltimore, Md., John R. Gerstein, Robert

M. Pozin, Washington, D.C., and Henry L. Conway, Jr. and Thomas B. Conway, Baltimore, Md., for defendants.

## MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

Presently pending before the Court are plaintiffs' and defendant American Casualty's cross-motions for summary judgment. At issue in these cross-motions is the interpretation of the "Directors' and Officers' Liability Insurance Policy for Savings and Loan Associations Including S & L Reimbursement" (hereafter "the policy") which was issued to the now insolvent Fidelity Federal Savings and Loan Association (hereafter "Fidelity"). For the reasons stated below, plaintiffs' motion is granted and defendant's motion is denied.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Facts*

Plaintiffs in this action are the Federal Savings and Loan Insurance Corporation (hereafter "FSLIC"), Howard International, Inc. (hereafter "Howard"), and Development Funding/Highpointe, Inc. (hereafter "Highpointe"). FSLIC, an instrumentality of the United States, is suing in its corporate capacity and as the subrogee of the rights of the depositors of Fidelity. Fidelity was a mutual savings and loan association organized under the laws of the United States and chartered by the Federal Home Loan Bank Board (hereafter "FHLBB"). The accounts of Fidelity were insured by FSLIC. Howard and Highpointe were wholly-owned subsidiary service corporations of Fidelity.

Individual defendants in this action, Heidrick (deceased), Chrzanowski, Smith, Korwek and White, were officers and directors of Fidelity, Howard and/or Highpointe. Defendant American Casualty Company of Reading, Pennsylvania (hereafter "American Casualty"), one of the CNA Insurance Companies, is a corporation doing business as an insurer. American Casualty purchased the policy here in issue from MGIC Indemnity Corporation, which originally issued the policy to Fidelity. American Casualty thus became the successor in interest to MGIC Indemnity Corporation.

On January 7, 1983, FHLBB placed Fidelity under a conservatorship on the grounds that Fidelity was insolvent, had suffered substantial dissipation of its assets or earnings due to a violation of law or an unsafe or unsound practice, and was in an unsafe or unsound condition to transact business. On August 24, 1984, because of Fidelity's continued insolvency, and also to effect an assisted merger, FHLBB appointed FSLIC as sole receiver for Fidelity. The claims of Fidelity against its officers and directors were assigned to FSLIC in its corporate capacity. In addition, ownership of all the capital stock of plaintiffs Howard and Highpointe was transferred to FSLIC in its corporate capacity.

The instant dispute has come about as a result of attempts by Fidelity's sole receiver, FSLIC, and Fidelity's conservator, Richard S. Mattison, to make American Casualty liable under the policy for losses visited upon Fidelity by the five defendant officers and directors. The policy was issued for a three year term beginning December 23, 1981. The aggregate limit of liability each policy year was $3,000,000, and the policy premium was $11,418, covering all three years. On February 17, 1984, prior to the appointment of FSLIC as receiver but while the policy was still in effect, Fidelity's conservator, Richard S. Mattison, wrote a letter to MGIC Indemnity Corporation notifying MGIC that he was the conservator for Fidelity. In this letter, Mattison told MGIC the following:

As Conservator and on behalf of the Association [i.e., Fidelity], I hereby am giving you written notice, pursuant to Section 6 of the policy, that I am aware of occurrences which may subsequently give rise to claims being made against the Directors and Officers of the Association as defined in Section 1(A) of the above mentioned policy, for one or more wrongful acts as defined in Section 1, Paragraph (E) of the policy. These

wrongful acts include possible self-dealing by certain officers and directors in the construction of the Association's main office building, and violations of regulations, breaches of fiduciary duty, and negligent acts and omissions by Officers and Directors in the discharge of their duties to the Association relating to the construction of Fidelity's main office building and by authorizing, approving and administering various loans and projects of the Association.

As specific information is developed concerning losses occasioned by the Officers and Directors, additional details will be made available. Although a total dollar amount of claim is not ascertainable at present, the total claim is expected to be well in excess of $3,000,000.

If you have any questions or require further information to perfect any claims under the policy, please do not hesitate to contact me.

On May 11, 1984, Richard L. Furlong, Senior Claim Analyst for the CNA Insurance Companies, wrote Mr. Mattison and acknowledged receiving Mattison's letter of February 17. He advised Mr. Mattison of the following:

[A]s of November 1, 1983, our company purchased the casualty insurance business of that corporation and thus the claim that you were submitting by your letter of February 17, 1984, will now be handled by this office by this writer, under file 92–410383.

Because this is a new claim and the issues are unclear at this time, we have submitted this matter to the law firm of Ross, Dixon & Masback at 2000 Pennsylvania Ave., Washington, D.C. 20036. We will ask Mr. Stewart Ross to assign this matter to a member of his firm and have them get in touch with you so that we might work together to try to determine the applicability of the coverages as they might relate to the claim that you are advising us of at this time.

On June 25, 1984, John R. Gerstein of Ross, Dixon & Masback wrote Mr. Mattison concerning the requirements for proper notice under the policy:

In order to serve as adequate notice under paragraph 6(a) of the policy, more detailed information concerning the alleged wrongful acts and pertinent circumstances is required, particularly with respect to the second potential claim [regarding possible wrongful acts in connection with "various loans and projects of the Association" (Mattison's February 17, 1984 letter.)] .... Please provide, among other things, additional information that will identify with more particularity the subject loans, and projects, and alleged wrongful acts.

Mr. Mattison subsequently referred the above letter to the firm of Squire, Sanders & Dempsey, which was representing Fidelity. On August 13, 1984, Glenn M. Young of Squire, Sanders wrote to inform Mr. Gerstein of the following:

We are in the process of gathering the "more detailed information concerning the alleged wrongful acts" that you request. We could immediately give you various items of information that are already in our file. However, I would prefer to give you a more organized and fuller presentation of this information. Unless you have some objection, I intend to provide you with this information during the week of August 27. Please feel free to telephone me, or James P. Murphy of this office, should you care to discuss this matter.

In fact, Mr. Young did not provide Mr. Gerstein with the memorandum detailing the wrongful acts until April 12, 1985. In his letter accompanying the memorandum, Mr. Young mentioned the fact that in the interim between his letter of August 13, 1984, and the April 12, 1985, memorandum, FSLIC had been appointed Fidelity's receiver. Mr. Young next addressed the reasons for the delay in providing the information:

Subsequent to the appointment of the receivership on August 27, 1984, I conferred with you by telephone and apprised you that these developments would necessitate some delay in providing you the information you requested. On August 28, 1985 [sic: 1984], Mr. Mark F. Gasser, Special Representative

for FSLIC as Receiver for Fidelity Federal, notified MGIC, by certified mail, of the appointment of the receivership and requested, under the policy, an extension of the period within which to discover and make claim for any loss sustained by the Fidelity Federal. Apparently, MGIC did not respond to that letter.

Counsel for American Casualty responded on May 28, 1985, by stating that coverage defenses possibly existed, including lack of adequate notice, and denied the claim. The parties reached an impasse, and the present action was filed by plaintiffs on January 7, 1986.

### B. *Procedural History*

FSLIC, Howard and Highpointe brought this action against the five former directors and officers and against American Casualty, alleging negligence and breach of fiduciary duty by the officers and directors in connection with various loans and projects of Fidelity, and seeking a declaration of rights under the policy. On February 20, 1986, American Casualty moved to dismiss plaintiffs' complaint. On March 27, 1986, plaintiffs opposed the motion, and on April 8, 1986, American Casualty filed its reply. On May 27, 1988, a hearing on the motion to dismiss was held before Judge Niemeyer of the United States District Court for the District of Maryland. By order dated May 31, 1988, Judge Niemeyer directed that the District Court would treat the motion to dismiss as a motion for summary judgment.

Consequently, on July 18, 1988, plaintiffs filed a cross-motion for summary judgment against American Casualty. A hearing on the cross-motions for summary judgment was held before the present Court on September 23, 1988. Between the time of American Casualty's reply to plaintiffs' original opposition on April 23, 1986, and the date of the last filing in the case, January 16, 1991, the parties have submitted eighteen (18) supplemental pleadings regarding newly decided authority.

**1.** These were the grounds given in defendant's original motion to dismiss, which Judge Niemeyer ordered be treated as a motion for sum-

## II. CROSS–MOTIONS FOR SUMMARY JUDGMENT

The appropriate procedures and standards for deciding cross-motions for summary judgment were aptly set out by Judge Ramsey in *Towne Management Corp. v. Hartford Accident and Indemnity Co.,* 627 F.Supp. 170 (D.Md.1985):

> When presented with cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." Wright, Miller & Kane, *Federal Practice and Procedure:* Civil 2d § 2720.
>
> A grant of a motion for summary judgment is appropriate only when "there is no genuine dispute as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56; *National Constructors Ass'n v. National Electrical Contractors Ass'n, Inc.,* 498 F.Supp. 510, 529 (D.Md.1980), *modified on other grounds,* 678 F.2d 492 (4th Cir.1982). In addition, there should be "no disagreement as to the inferences which may be drawn from the undisputed facts." *Steinberg v. Elkins,* 470 F.Supp. 1024, 1030 (D.Md.1979). The burden is on the moving party and any doubts as to the existence of a genuine issue of material fact will be resolved against the movant. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

627 F.Supp. at 172. Applying these standards and procedures, the Court will first consider defendant's cross-motion, and then move on to a consideration of plaintiffs' cross-motion.

### A. *Defendant's Cross–Motion for Summary Judgment*

Defendant bases its cross-motion for summary judgment (hereafter "defendant's cross-motion") on the two following grounds [1]:

mary judgment. *See* Order (Niemeyer, J.) dated May 31, 1988.

(1) American Casualty's Policy expressly *excludes coverage for claims* made against the directors and officers *based upon or attributable to any claim or action or proceeding brought by FSLIC.* The instant suit against Fidelity's former directors and officers is a suit brought by FSLIC; and

(2) The Policy *provides no coverage for claims made outside of the Policy period.* This claim was not made, nor was proper notice given, until after the Policy had terminated.

Defendant's February 20, 1986, Memorandum in Support of Cross-Motion at 2. (Original emphasis.) While the Court may enter judgment in the cross-motion on other grounds "if the parties have had an adequate opportunity to argue and present evidence on that point and summary judgment otherwise is appropriate", Wright, Miller & Kane, *Federal Practice and Procedure:* Civil 2d § 2719, these two grounds are the ones which have been continuously raised by the parties over the course of the litigation, and they will serve as appropriate points of departure.[2]

The Court will first discuss the issue of whether proper notice of claim(s) was given by plaintiffs, for if notice was not properly given, coverage would thereby be excluded and defendant's other principal ground would be rendered moot.

### 1. Notice of Claim(s).

▇ Defendant/movant believes coverage under the policy is barred because plaintiffs did not give adequate notice of their potential claims. Defendant's argument on this issue is summarized as follows:

[T]he policy provides coverage for claims made within the policy period.... It also provides coverage for claims made within any extended discovery period available and purchased under Section 2(B) of the Policy.... And a claim made subsequent to the Policy period, as to which notice was given within the Policy period as provided in Section 6, is treated as a claim made within the policy period.... Because there was no claim made against the directors and officers within the policy period, no extension of the discovery period, and no timely and adequate notice of potential claim, the claim against the directors and officers is not covered under the policy.

Defendant's Memorandum in Support of Motion at 10. Defendant further asserts that the February 17, 1984, letter which Mr. Mattison sent to the insured was too vague to amount to notice of an occurrence which may subsequently give rise to a claim. In his letter, Mattison stated that he was giving the insurer written notice pursuant to Section 6 that he was "aware of occurrences which may subsequently give rise to claims being made against the Directors and Officers of the Association." Mattison's February 17, 1984, letter. Defendant contends that "[b]ecause virtually everything the directors and officers did on behalf of Fidelity involved 'various loans and projects of the Association,' an Insured could contend that *any* claim subsequently made against the directors or officers had been the subject of the Conservator's 'notice' of potential claim." Defendant's Memorandum in Support of Motion at 14. Defendant, however, did not cite any au-

---

**2.** The Court notes at this point that, in its initial motion to dismiss, defendant also prayed for the dismissal of Howard and Highpointe, because, defendant claimed, "they lack standing to bring this action and because they have failed to plead a necessary element of their cause of action". Defendant's motion to dismiss at 17. Defendant later asserted that Howard and Highpointe were excluded from coverage by operation of Endorsement No. 2 (*see* discussion of Endorsement No. 2, *infra*). No pleading from either party has addressed this issue since the motion to dismiss was converted to cross-motions for summary judgment.

The Court, after a thorough examination of the complaint, finds that Howard and Highpointe did plead a necessary element of their cause of action in paragraphs 22, 23, 92 and 93, respectively. As such, they have standing to sue. As for their coverage under Endorsement No. 2, since they were wholly-owned subsidiaries of Fidelity which were insured like Fidelity under the policy (*see* Section 1(A) of the Policy), whatever conclusions the Court draws regarding Fidelity will apply to Howard and Highpointe as well.

thority beyond the policy itself for the proposition that proper notice requires more particularity than that given here.

Plaintiffs' position is that notice was given within the policy period as provided by Section 6 of the policy when Mr. Mattison wrote to the defendant on February 17, 1984. Plaintiffs assert that the April 12, 1985, memorandum describing the claims in more detail was supplied under Section 6(B) of the policy, which applies when claims have already been made, and not under 6(A), the provision covering notice of potential claims.

The controlling language in this instance is found in Section 6 of the policy, entitled "Notice of Claims":

(A) If during the policy period the Association or the Directors or Officers shall: (i) receive written or oral notice from any party that it is the intention of such party to hold the Directors and Officers, or any of them, responsible for a Wrongful Act; or (ii) become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and Officers, or any of them, for a Wrongful Act; and shall, during such period, give written notice thereof to the insurer as soon as practicable and prior to the date of termination of the policy, then any claim which may subsequently be made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the policy year in which such notice was given.

(B) The Association or the Directors or Officers shall, as a condition precedent to their rights under this policy, give to the insurer notice in writing as soon as practicable of any claims made and shall give the insurer such information and cooperation as it may reasonably require.

The Court finds that there is no genuine dispute as to any material facts regarding the issue of notice, and as such, a ruling on the motion for summary judgment on this ground is appropriate. The only undisputed facts which the Court finds necessary on this issue are (1) the validity of the policy, and (2) the fact that Mr. Mattison's letter of February 17, 1984, was received by defendant within the policy period. Based on this set of facts, the Court concludes that proper notice under the policy was given by plaintiffs to defendants.

Section 6(A) of the policy requires that plaintiffs give written notice to defendant, as soon as practicable and prior to the termination date of the policy, that plaintiffs have become aware of some occurrence(s) which may subsequently give rise to a claim being made against them for a wrongful act. Plaintiffs here, by the Mattison letter of February 17, 1984, gave such written notice to defendants. The language of Section 6(A) does not indicate that notice need be any more particularized than that which was here given, nor did defendant point to any persuasive authorities for the proposition that more detail is required. Section 6(B), in contrast, does compel plaintiffs to provide such information as defendant would "reasonably require" *after* claims have been made against the officers and directors. But that is not the type of notice that is required for a claim made subsequent to the policy period to be covered under the policy. Those requirements are set out in Section 6(A), which speaks of "*any* occurrence which *may* subsequently give rise to a claim." It would be impracticable, indeed, unreasonable, to require that plaintiffs give highly detailed accounts of the occurrences which may give rise to claims when those claims have not yet even been made.

As defendant rightly observes in its February 20, 1986, Memorandum in Support of the Cross–Motion; "the purpose of requiring notice of potential claims.... is to provide 'a certain date after which an insurer knows that it no longer is liable under the policy, and accordingly, allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.' *City of Harrisburg v. International Surplus Lines Insurance Co.*, 596 F.Supp. 954, 962 (M.D.Pa.1984), *aff'd*, 770 F.2d 1067 (3d Cir. 1985)." Defendant's Memorandum in Support of Cross–Motion at 15. Plaintiffs' no-

tice in this case satisfied the above purpose by notifying defendant within the policy period that they were aware of occurrences which could subsequently give rise to claims well in excess of $3,000,000.00, the policy limit. Defendant was thus given a date certain and information which would allow it to fix its reserves accurately and compute premiums. Such notice by plaintiffs being proper, summary judgment cannot be granted to defendant on the ground of inadequate notice. The Court will therefore go on to consider whether defendant should be granted summary judgment on its other asserted ground: express exclusion of coverage under Endorsement No. 2 to the policy.

### 2. Endorsement No. 2.

■ Defendant contends that Endorsement No. 2 to the policy clearly excludes coverage by defendant for any suit brought by FSLIC against the officers and directors of Fidelity. Defendant bases its contention on the following: (1) the plain language of the endorsement, and (2) case law interpreting the same, or similar, endorsements.

Endorsement No. 2 to the policy reads as follows:

It is understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers based upon or attributable to: any claim or action or proceeding brought by the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation.

Defendant asserts there should be no coverage because "the plain meaning of the words of the Endorsement" which it claims is "simply not ambiguous". Defendant's Reply Memorandum at 3–4.

■ Additionally, defendant has called to the Court's attention several cases which it believes lend support to its position. None of these cases constitute controlling precedent in this Court, which, as both parties agree, is to apply Maryland law. The rule of insurance policy construction in Maryland when the only precedents are from non-binding sister jurisdictions is as follows: when an insurance policy has had an apparent nationwide use and has been judicially construed uniformly in several states, the parties to the policy are deemed to have adopted such construction as their own. *See, e.g., Stanley v. American Motorist Insurance Co.*, 195 Md. 180, 73 A.2d 1 (1950). In the instant case, however, there has been no uniform judicial construction of the exclusion here in issue. Defendant cites cases which construe the exclusion as unambiguous and denying coverage, while plaintiffs provide the Court with cases where the opposite was held. As no clearly persuasive guidance may be had from the cases cited by the parties when taken as a whole, the Court must turn to Maryland's settled rules of insurance policy construction and apply to these the undisputed facts of this case in order to determine whether or not the exclusion is ambiguous.

The most complete exposition of Maryland's rules of construction for insurance policies is found in *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 488 A.2d 486 (1985):

An insurance contract, like any other contract, is measured by its terms unless a statute, a regulation, or public policy is violated thereby.... To determine the intention of the parties to the insurance contract, which is the point of the whole analysis, we construe the instrument as a whole.... Maryland courts should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution....

In so doing, we accord words their ordinary and accepted meanings. The test is what meaning a reasonably prudent layperson would attach to the term....

In the first instance the inquiry is confined to analysis of the language used.... Courts may construe unambiguous contracts as a matter of law.

The language used may be ambiguous if it is "general" and may suggest two meanings to a reasonably prudent layperson.... If the language of the contract

is ambiguous, extrinsic evidence may be consulted to determine the intention of the parties and whether the ambiguous language has a trade usage.... Construction of the contract by the parties to it before the controversy arises is an important aid to interpretation of uncertain terms....

If the extrinsic evidence presents disputed factual issues, construction of the ambiguous contract is for the jury. The court may construe an ambiguous contract if there is no factual dispute in the evidence.

302 Md. at 388–389 (citations omitted).

The Court, then, must first examine the terms of the exclusion, and determine whether those terms are ambiguous or unambiguous. The Court is of the opinion that these terms cannot be described as "general". In fact, they are quite specific. Confusion as to the exclusion would not arise because the words are difficult to define.

The language in the exclusion, on the other hand, "may suggest two meanings to a reasonably prudent layperson." If a reasonably prudent layperson were to strictly construe the exclusion, he could interpret it to mean that the insurer would not make a payment for any loss brought about by a claim against the directors or officers which was based upon or attributable to a claim, action or proceeding brought by FSLIC. Which is to say, that the insurer would not give coverage for any loss caused by "secondary suits", i.e., suits brought after, and based upon, a suit by FSLIC. In addition to the reasonably prudent layperson, a number of courts have interpreted such exclusions to mean as much. *See, e.g., American Casualty Co. v. FDIC,* 677 F.Supp. 600 (N.D.Iowa 1987) ("[D]efendants contand [sic] that this provision applies only to 'secondary' suits occasioned by actions brought by the FDIC against third parties, not direct actions by FDIC. The Court is persuaded that this is not a strained or unnatural reading of the exclusion's terms." 677 F.Supp. at 603.), *rev'd* by No. C86–4018 (N.D.Iowa 1990); *FSLIC v. Mmahat,* 1988 WL 19304

(E.D.La.) ("The [District Court for the Northern District of Iowa] found the exclusion ambiguous because it was susceptible to an interpretation that it applies only to "secondary" suits brought by the FDIC against third parties, not direct actions by FDIC. The Court finds this reasoning apposite." 1988 WL 19304 at *2.)

Alternatively, the reasonably prudent layperson could interpret the exclusion broadly, and believe that the insurer would provide no coverage for loss which was in any way attributable to a suit brought by FSLIC. Indeed, several courts have also reached this conclusion. *See, e.g., Continental Casualty Co. v. Allen,* 710 F.Supp. 1088 (N.D.Tex.1989) ("The contractual language of Endorsement 1 clearly excludes claims by FDIC and *is not* ambiguous. The Court therefore adopts the obvious, reasonable interpretation." 710 F.Supp. at 1097.); *Gary v. American Casualty Co. of Reading, Pa.,* 753 F.Supp. 1547 (W.D.Okla. 1990) ("Although the language 'based upon or attributable to' is awkward when used in conjunction with the language 'any action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation,' the Court finds the FDIC's construction of this exclusion to be strained and unreasonable." *Id.* at 1550. Footnotes excluded.)

Since the Court believes the language here may suggest two meanings to a reasonably prudent layperson, the Court finds the exclusion ambiguous under the *Pacific Indemnity* standard. Continuing with the analysis laid out in *Pacific Indemnity,* the Court may consult extrinsic evidence in an attempt to determine the intention of the parties and whether the ambiguous language has a trade usage. In this regard, the construction given the policy by the parties before the dispute is an important aid in interpretation.

Both plaintiffs and defendant have made clear to the Court that they do not believe extrinsic evidence is necessary to interpret the exclusion. Defendant stated that "[e]xtrinsic evidence bearing on the intention of the parties need not be considered because the language of the exclusion is clear and

unambiguous." Defendant's September 22, 1988, Supplement to Defendant's Opposition to Plaintiffs' Cross–Motion at 1–2. Plaintiffs asserted that "[i]n this action ... there is no extrinsic evidence of the parties' intent." Plaintiffs' August 22, 1988, Reply to Defendant's Opposition to Plaintiffs' Cross–Motion at 8. Indeed, no admissible extrinsic evidence tending to show the existence of a disputed factual issue has been proffered by either party.

■ Consequently, since there is no factual dispute in the evidence, the Court will proceed to construe the ambiguous exclusion. At this stage, following the rules of construction set out in *Pacific Indemnity*, "[i]f no party presents extrinsic evidence bearing upon the meaning of the ambiguous term, 'we would normally apply the "principle of contract construction that where one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against that party." ' " *Pacific Indemnity*, 302 Md. at 405, 488 A.2d 486 (quoting *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 199, 438 A.2d 282 (Md.1981) (quoting *Truck Ins. Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 435, 418 A.2d 1187 (Md.1980))). Therefore, the Court resolves the present ambiguity against defendant American Casualty, as they are the party responsible for the drafting of the instrument. Defendant's cross-motion for summary judgment on the grounds of improper notice and the plain language of Endorsement No. 2 is therefore denied.

B. *Plaintiffs' Cross–Motion for Summary Judgment*

Plaintiffs' cross-motion for summary judgment is based on the same issues which constituted defendant's grounds for cross-motion. Plaintiffs argue that as a matter of law, (1) notice of claim(s) was properly given, and (2) Endorsement No. 2 is ambiguous and should be construed against defendant. The above analysis, then, applies as well to plaintiffs' cross-motion, and that motion is therefore granted. There is no need, therefore, to address plaintiffs' other arguments for having summary judgment granted in their favor and denied to defendant.

Accordingly, the Court will enter a separate Order denying defendant American Casualty's cross-motion for summary judgment and granting plaintiffs' cross-motion for summary judgment.