[897 NYS2d 405]

JPMorgan Chase & Co. et al., Respondents, v The Travelers Indemnity Company et al., Defendants, and Twin City Fire Insurance Company, Appellant.

First Department, March 18, 2010

## APPEARANCES OF COUNSEL

*Arkin Kaplan Rice LLP*, New York City (*Howard J. Kaplan, Lisa C. Solbakken, Michael J. McLaughlin* and *Elizabeth A. Fitzwater* of counsel), for appellant.

*Proskauer Rose LLP*, New York City (*John H. Gross, Steven E. Obus, Francis D. Landrey* and *Michelle R. Migdon* of counsel), for respondents.

## OPINION OF THE COURT

ABDUS-SALAAM, J.

In this declaratory judgment and breach of contract action, plaintiffs JPMorgan Chase & Co., JPMorgan Chase Bank and J.P. Morgan Securities, Inc. (collectively JPMC) seek a declaration that defendant Twin City Fire Insurance Company (Twin City) is obligated to indemnify them in the amount of the limits of their coverage ($22.5 million) for losses incurred in connection with the defense and settlement of a series of federal court class action suits arising out of Enron's financial collapse, as well as several lawsuits filed by Enron investors in state courts. JPMC ultimately paid more than $2.2 billion to settle the Enron actions. The motion court rejected Twin City's defenses, including that JPMC had failed to comply with the notice provision of the "claims-made" policy at issue here, and directed that judgment be entered in favor of plaintiffs in the amount of $22,500,000 plus prejudgment interest, together with costs and disbursements, altogether amounting to $28,359,180.14.

Twin City was a $22.5 million participant in a combined lines program providing JPMC with a total of $200 million in bankers professional liability insurance, effective November 30, 1997 to November 30, 2001 (the 97-01 Program). Twin City was not a participating insurer at the inception of the 97-01 Program, but, effective July 15, 2000, replaced Reliance Insurance

Company as an excess insurer by providing coverage for the second excess layer of $10 million excess of $30 million and for the sixth excess layer of $12.5 million excess of $70 million. The binders issued by Twin City adopted the terms of coverage as bound by Reliance, which incorporated the terms and conditions of the primary policy issued by Lloyd's, London. The "claims-made" policy afforded coverage both for claims made against the insured during the policy period, as well as claims made subsequent to the policy period, provided that the insured gave notice during the policy term of any act, error or omission that may subsequently give rise to a claim. As set forth in the Lloyd's primary policy:

> "If during the Policy Period . . . the Risk and Insurance Management Department shall become aware of any act, error or omission which may subsequently give rise to a claim being made against an Insured and shall during the Policy Period . . . give written notice of such act, error or omission, then any claim which is subsequently made against the Insured arising out of such act, error or omission shall for the purpose of this policy be treated as a claim made during the Policy Period."

An addendum to the Lloyd's primary policy substituted the words "Wrongful Act" for all references to "acts, errors or omissions" throughout the policy. Another addendum defined "Wrongful Act" to include any

> "(i) act, error or omission by the Insured or any person or entity for whom the Insured is legally responsible, or

> "(iv) dishonest or fraudulent act or omission by any officer or employee of the Named Corporation or any Subsidiary Company."

The record shows that in late November 2001, as the 97-01 Program was nearing expiration and JPMC was seeking renewal of its insurance for the 2001-2002 policy period, Enron's credit rating had been downgraded to junk status and there was speculation in the press that Enron was headed for bankruptcy. According to Richard Straub, vice-president, corporate insurance services for JPMC, the insurers that were considering participating in the renewal program, including Twin City, "began to balk at providing coverage for Enron claims under the subsequent program [because they] did not want to ef-

fectively 'buy a loss.' " These insurers inquired as to whether JPMC had noticed or was going to notice Enron claims under the 97-01 policy, and certain of them made clear that JPMC must provide notice of the Enron circumstances to the 97-01 insurers as a condition of these prospective insurers binding coverage under the new 01-02 Program. Mr. Straub, in conjunction with others, made the decision to notice potential claims to the 97-01 Program both because he was concerned about potential claims that might arise from JPMC's provision of professional services to Enron and because he wanted to obtain coverage for the 01-02 period.

On November 29, 2001 JPMC's insurance broker, Marsh & McLennan, sent an e-mail to the 01-02 insurers, including Twin City, outlining the terms pursuant to which the insurers agreed to bind coverage:

> "As discussed, it was agreed to put the expiring contract on notice of the ENRON circumstance. JP Morgan Chase is in the process of drafting this notice and putting the prior policy on notice. It was also agreed, that in the event a Claim does arise out of this ENRON matter, this current policy shall apply (subject to this policy's terms and conditions) in the event that there is a final adjudication that no coverage exists under the prior Blended policy solely due to such claim not fulfilling the notice requirements under the prior policy—wording to be agreed."

Twin City's binder for the 01-02 Program provides that it will follow the terms and conditions of the November 29, 2001 e-mail. Stephen Guglielmo, a Twin City underwriter, testified that Enron's demise caused him concern about the renewal of JPMC's policy because of the possible exposure to an Enron claim, and that as he recalls, Enron claims were going to be noticed for the 97-01 policy and excluded from the 01-02 policy which gave him "some comfort in being part of an ongoing program with JPMorgan Chase."

On November 29, 2001 at 9:00 P.M., three hours before the 97-01 policy was to expire, JPMC sent the following e-mail to Twin City through its broker, Marsh:

> "On November 28th 2001 it was announced that various credit agencies had downgraded Enron, Inc. debt to junk status. In addition it was announced that merger discussions with Dynegy, Inc. had been

terminated. In light of this situation J.P. Morgan Chase & Co. released a statement disclosing that it has approximately $500 million of unsecured exposure to various Enron entities, including loans, letters of credit and derivatives. It was also confirmed that it has additional exposures of $400 million secured by the Transwestern and Northern Natural pipelines.

"J.P. Morgan Chase & Co. and its subsidiaries and affiliates, and their directors and officers ('JP Morgan Chase') have an extensive relationship with Enron which includes, but is not necessarily limited to, lending, merger & acquisition advisory services, restructuring advisory services, various SWAPS transactions, purchaser of gas/energy and serving as indenture trustee for Enron's public debt. While we have not received notice of any claim or potential claim at this time[,] it is anticipated that we may be named in litigation expected to arise out of the financial difficulties of Enron as a result of the relationship described above."

Fifteen minutes later, JPMC, again through Marsh, sent another e-mail which advised "PLEASE DISREGARD THE EARLIER EMAIL REGARDING THIS MATTER." The second e-mail contained the language quoted above, but with the following language added:

"Such litigation could include, among other things, allegations of breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, errors and omissions, securities fraud, negligence (including gross negligence), fraudulent conveyance, equitable subordination and misrepresentation. While JP Morgan Chase would vigorously contest the validity of any such claims, and has no actual knowledge of such acts, we believe that all of the foregoing constitute Wrongful Acts that could give rise to a claim under the policy."

Twin City responded on November 30, 2001 with a letter acknowledging receipt of the correspondence, informing Marsh of the name of the individual assigned to the matter, and stating that "[i]n the meantime all rights and defenses afforded under any applicable policy, at law, or in equity should be considered reserved." On January 17, 2002, Lloyd's accepted

the notice "as notice of a potential claim under the BPL [bankers professional liability] section of the [p]olicy." Subsequently, other insurers did so as well. Only one excess insurer, American International Specialty Lines Insurance Company (AISLIC), asserted that the notice was deficient. AISLIC, which was a defendant in this lawsuit, ultimately settled with JPMC for its Enron claims under the 97-01 Program after the motion court denied its motion for an order dismissing the complaint pursuant to CPLR 3211 (a) (1) and (7).

Twin City never indicated to JPMC its position that the notice was in any way deficient until this litigation, where in its answer it asserted affirmative defenses alleging, among other things, that coverage is barred because JPMC failed to satisfy conditions precedent to coverage, failed to provide timely, sufficient and appropriate written notice of claims and made false statements in the notices of claims.

Additionally, Twin City maintains that it has no obligation under the 01-02 policy, and has interposed counterclaims seeking damages and rescission of its participation in the 01-02 Program, alleging that it was induced to renew coverage to JPMC as the result of the fraudulent misrepresentation contained in the notice that JPMC had "no actual knowledge" of acts that could give rise to claims in connection with Enron under the 97-01 Program, when JPMC in fact had actual knowledge that it had assisted Enron in manipulating its financial statements, and had learned "[b]y no later than November 19, 2001 . . . that many of the transactions it had either designed for Enron, or had engaged in as a participant, were directly responsible for Enron's deteriorating financial conditions."

Twin City initially moved in July 2006 for an order pursuant to CPLR 3211 (a) (1) and (7) dismissing the complaint on the ground that JPMC's November 29, 2001 e-mail did not provide it with sufficient notice of the potential claim. The motion court denied the motion, finding that the notice was sufficient. In June 2007, in response to a motion by JPMC for partial summary judgment, Twin City cross-moved for summary judgment, again asserting that the notice was legally insufficient. That cross motion was denied. In June 2008, following extensive discovery, JPMC moved, in this action and two related actions it had commenced against Twin City arising out of Twin City's refusal to indemnify JPMC in connection with professional services rendered to other corporations (the WorldCom action and the National Century Financial Enterprises, Inc., action), for

partial summary judgment dismissing Twin City's counterclaims and certain affirmative defenses. Twin City cross-moved (in this action only) for summary judgment dismissing the complaint on the ground that the notice was insufficient to invoke coverage under the 97-01 policy period. JPMC "cross-moved"* (in this action only) for partial summary judgment dismissing the affirmative defenses to the extent that they contested the legal sufficiency of the notice. On March 10, 2009 the motion court granted JPMC's motion for partial summary judgment dismissing Twin City's affirmative defenses insofar as they challenged the sufficiency of the notice, denied Twin City's cross motion for summary judgment, and ordered that JPMC's motion for summary judgment dismissing defendant's counterclaims and certain affirmative defenses was sub judice and that the remainder of the action was to continue. In December 2008, following the completion of discovery, JPMC moved for summary judgment on all remaining liability issues and damages. The motion was granted and Twin City appealed from the March 10 order and the May 21, 2009 judgment.

The motion court correctly held that the notice to Twin City was valid under the 97-01 Program. Twin City argues that JPMC did not meet the condition precedent to coverage because (1) at the time of the notice, JPMC's Risk and Insurance Management Department, in particular Mr. Straub, had no awareness of any wrongful act, and (2) the notice did not identify any specific wrongful act. Twin City puts great stock in the fact that the notice states that JPMC has no actual knowledge of the acts listed, including breach of fiduciary duty, misrepresentation, fraud and negligence, and that Straub testified that the notice was JPMC's "effort to identify the types of acts and activities which we were involved with which, not specific to us, JPMorgan Chase, but as a general situation could, in the financial world . . . give rise to a claim."

However, Twin City's assertion that there was no awareness by JPMC of any wrongful acts, but only conjecture, rings hollow. It is clear from the record that there was heightened awareness, by both JPMC and its insurers in the days prior to the expiration of the 97-01 policy, of the impending implosion of JPMC's client Enron, which awareness led to the last minute fil-

* The motion court noted the impropriety of attempting to file a cross motion to a cross motion but nonetheless considered the application, in the absence of prejudice to Twin City, which had submitted its opposition to that application.

ing of the notice of potential claims encompassing wide-ranging legal and financial issues that were almost certain to arise.

It is beyond cavil that the entire purpose of the notice, from both the perspective of the insured and the insurers, including Twin City, was "to put the expiring contract on notice of the ENRON *circumstance*" (emphasis added). And the notice accomplished this goal, as it presaged the allegations of the Enron lawsuits, including claims that JPMC, as one of the principal lending banks, loaning over a billion dollars to Enron, knew that Enron was falsifying its publicly reported financial results and that JPMC helped raise over $2 billion from the investing public for Enron and made false and misleading statements in registration statements and prospectuses used by Enron to raise billions of dollars in new capital for Enron. The notice identified claims that were likely to arise out of enumerated acts and in the context of the particular unfolding circumstances of the Enron debacle, all of which were described in the notice.

In a "claims-made" policy, the purpose of the provision requiring notice of potential claims before the end of the policy is to provide "a certain date after which an insurer knows that it no longer is liable under the policy, and accordingly, allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty" (*City of Harrisburg v International Surplus Lines Ins. Co.*, 596 F Supp 954, 962 [MD Pa 1984], *affd* 770 F2d 1067 [3d Cir 1985]).

The notice here, with its reference to Enron and its catalog of the transactions with Enron, is analogous to, if not more detailed than, other notices that have been held to be sufficient pursuant to similar notice provisions in claims-made policies.

For example, in *Federal Sav. & Loan Ins. Corp. v Heidrick* (774 F Supp 352, 355 [D Md 1991], *on reconsideration sub nom. Federal Deposit Ins. Corp. v Heidrick*, 812 F Supp 586 [D Md 1991], *affd sub nom. Federal Deposit Ins. Corp. v American Cas. Co. of Reading, Pa., Inc.*, 995 F2d 471 [4th Cir 1993]), where the notice set forth wrongful acts including "possible self-dealing by certain officers and directors in the construction of the . . . main office building, and violations of regulations, breaches of fiduciary duty, and negligent acts and omissions by Officers and Directors . . . relating to the construction of [the] main office building and by authorizing, approving and administering various loans and projects," the court held that the notice satisfied the purpose of the policy by giving the insurer a date certain and allowing it to fix its reserves accurately and compute premiums. In *Bodewes v Ulico Cas. Co.*

(336 F Supp 2d 263 [WD NY 2004], *affd in part and vacated in part on other grounds sub nom. Burke v Ulico Cas. Co.*, 165 Fed Appx 125 [2d Cir 2006]), the notice was held valid where the Trustees of the Buffalo Carpenters Health Care Premium Benefit, Annuity & Pension Funds gave notice that claims would likely be made as the result of the decline in the financial status of the funds and of certain specific instances of alleged mismanagement, "as well as additional claims [that] would be likely to result in the filing of legal action against the Trustees" (336 F Supp 2d at 278 [internal quotation marks omitted]).

Furthermore, in *Resolution Trust Corp. v American Cas. Co. of Reading, Pa.* (874 F Supp 961 [ED Mo 1995]), the court upheld a notice by a savings and loan reporting that a Federal Home Loan Bank Board supervisor had made statements regarding certain real estate projects to the effect that because of some deficiencies in documentation, if the projects resulted in losses, responsibility for these losses would be placed directly on the bank's board of directors. A follow-up letter contained the identity of a potential claimant and "very vague descriptions of the circumstances under which the insureds became aware of a potential claim and the nature of claim" (*id.* at 965). The court rejected the insurer's contention that the letters did not provide "enough specific information to constitute adequate notice" (*id.*), noting that there was no requirement of such specificity in the policy. Nor is there such a requirement of specificity in this policy, which requires only that the insured give written notice of "Wrongful Act[s]," defined as any act, error or omission, or dishonest or fraudulent act or omission.

Twin City's citation to *Home Ins. Co. v Cooper & Cooper, Ltd.* (889 F2d 746 [7th Cir 1989]) is unpersuasive, as it actually supports JPMC's position. In *Home Ins.*, an attorney who was the sole shareholder of his firm embezzled from accounts held by his firm, casting the firm into bankruptcy. The bankruptcy trustee made claims before the policy expired on every matter the firm had ever handled. The court held the notice ineffective, finding that

> "[i]f the trustee had reason to believe that the firm's work *in a given case* would lead to liability, it was entitled under the policy to inform the insurer within the period of coverage and so ensure indemnity if the potential came to pass. An effort to lodge claims on everything, to extend indefinitely the coverage of a 15-month policy, has no similar effect;

it is merely vexatious" (*id*. at 750 [emphasis added]).

Here, the notice focused on a given situation—the Enron collapse—and set forth the many different aspects of professional services that might give rise to claims.

Similarly, Twin City's reliance on *American Cas. Co. of Reading, Pa. v Wilkinson* (1990 WL 302175, 1990 US Dist LEXIS 20153 [WD Okla 1990]) is misplaced. In that case, the insured bank's notice listed 50 different individuals or entities who did business with the bank, and unlike the notice here, "[no] information was given about the events or circumstances giving rise to these alleged potential claims" (1990 WL 302175, *3, 1990 US Dist LEXIS 20153, *9).

In sum, the notice here was sufficient and the insured met the condition precedent for coverage.

We have considered Twin City's other arguments and find them unavailing, including the assertion that the loss arising out of the defense and settlement of the underlying litigation was not entirely for "professional services" covered under the policy and that there should have been some allocation performed by the trial court in awarding damages. Professional services is defined broadly in the policy to include all services provided by JPMC, including, but not limited to, investment banking activities and lending activity. The underlying litigation specified these types of activities as giving rise to the claims. Thus, the losses are covered under the policy.

Accordingly, the judgment of the Supreme Court, New York County (Charles E. Ramos, J.), entered May 21, 2009, awarding plaintiffs the aggregate amount of $28,359,180.14 against defendant-appellant pursuant to an order, same court and Justice, entered May 19, 2009, which granted plaintiffs' motion for summary judgment, and order, same court and Justice, entered March 10, 2009, which, inter alia, granted plaintiffs' motion for partial summary judgment and denied appellant's cross motion for summary judgment dismissing the complaint should be affirmed, with costs.

GONZALEZ, P.J., SAXE, MOSKOWITZ and ROMÁN, JJ., concur.

Judgment, Supreme Court, New York County, entered May 21, 2009, and order, same court, entered March 10, 2009, affirmed, with costs.