Sharon JOHNSON, PH.D.

v.

Dr. Louis W. SULLIVAN.

No. HM–89–2999.

United States District Court,
D. Maryland.

Feb. 8, 1991.

---

4. *See* § 903(b)(1).

5. A general reading of the CZM Act discloses a legislative intent that permit conditions be reasonable and decisions regarding the granting of permits be made timely. I note plaintiff's apprehension that resort to administrative proceedings will result in unwarranted delay; however, I cannot assume, as plaintiff has, that resort to these procedures will result in unwarranted delay and, thus, administrative remedies must be pursued first.

Debra Katz, Bernabei & Katz, Washington, D.C., for plaintiff.

Jamie M. Bennett, Baltimore, Md., Eileen M. I. Houghton, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, Senior District Judge.

Presently before this Court are plaintiff's Motion for Partial Summary Judgment, defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment, and two Motions to Strike filed by the plaintiff. Plaintiff has brought this action alleging sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and handicap discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. The Court has considered the materials submitted by both sides and is prepared to rule. No hearing is deemed necessary. Local Rule 105.6.

Since the resolution of the motions to strike will affect the record before the Court, those motions will be resolved first. Plaintiff has moved to strike thirty-six exhibits [1] attached to defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment. Plaintiff contends that certain exhibits must not be considered by the Court because they have not been certified, sworn to, or authenticated by affidavit as required by Rule 56(e) of the Federal Rules of Civil Procedure. "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A

---

1. Plaintiff moves to strike exhibits 10, 11, 12, 14, 17, 18, 19, 21, 26, 30, 31, 39, 48, 51, 52, 53, 54, 55, 57, 59, 62, 63, 66, 74, 75, 81, 83, 84, 85, 88, 89, 90, 91, 92, and 95.

C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2722 at 58–60 (2d 3d.1983). The Court agrees that since these exhibits do not meet the requirements of Rule 56(e), they should be stricken from the record.

Next, plaintiff moves to strike six pages of defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment. In these pages defendant argues that plaintiff's sexual harassment and handicap discrimination claims are time-barred. Plaintiff contends that these arguments should have been in the defendant's motion rather than the reply and should be stricken because plaintiff has not had an opportunity to oppose them. Defendant first made the argument that the sexual harassment and handicap accommodation claims were time-barred in defendant's response to plaintiff's motion for partial summary judgment. Plaintiff had moved for summary judgment only on the Rehabilitation Act claim, so defendant's argument that the sexual harassment claim was time-barred should not have appeared in the opposition to plaintiff's motion for summary judgment. In its reply, plaintiff responded that the Rehabilitation Act claim was timely, but did not address the sexual harassment issue since plaintiff was not moving for summary judgment on that claim. Defendant did not raise the timeliness issues in its motion to dismiss, or, in the alternative, for summary judgment, but raised them in the reply to plaintiff's opposition. The Court agrees that defendant's timing in briefing the issues of timeliness was incorrect and confusing. However, because the timeliness issue is important to establishing whether these claims should be before this Court at all, it would serve judicial economy to resolve these issues now rather than await further briefing or refiling of new motions. The Court also notes that plaintiff did address the timeliness of the Rehabilitation Act claim in her reply to defendant's opposition to plaintiff's motion for summary judgment, and the authorities cited therein would apply to the sexual harassment claim. The Court feels that a proper ruling on the timeliness

issue can be made based on the facts alleged in the complaint. Accordingly, the Court will deny plaintiff's motion to strike the defendant's argument that the claims are time-barred.

The Court will now address the cross-motions for summary judgment. Because material outside the pleadings was presented, defendant's motion will be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Rule 12(b), Fed.R.Civ.P.

## FACTUAL BACKGROUND

Plaintiff, Dr. Sharon Johnson, suffers from a sleep disorder called idiopathic CNS hypersomnolence, which is a form of excessive sleepiness or narcolepsy. Dr. Johnson was also diagnosed to have cardiac arrhythmias, a condition of the heart which causes atrial fibrillation, a rapid, erratic heartbeat which can lead to cardiac arrest or strokes. This heart condition prevents Dr. Johnson from being able to take stimulants which are normally prescribed for narcolepsy. In addition, Dr. Johnson had surgery for breast cancer in 1980 and requires periodic check-ups to monitor any recurrence. Plaintiff also suffered from "severe stress disorder." Plaintiff submits that these medical conditions render her "handicapped" within the meaning of the Rehabilitation Act.

On September 9, 1979, Dr. Johnson began to work for the National Institute of Health ("NIH") in the Grants Associate Program, a one-year training program. After the training, she worked in the National Institute of Dental Research until July, 1984, when she was hired as a Health Scientist Administrator in the Biomedical Sciences Review Section of the Referral and Review Branch of the Division of Research Grants ("DRG"). She held the GS–14 position of Executive Secretary of the Pathobiochemistry Study Section, which is a group of scientists who review biomedical research grant applications to determine which applicants should receive NIH grants. As Executive Secretary, Dr. Johnson was required to attend the meetings of the Study Section, take minutes of the

meetings, and write reports which summarize the Study Section's discussion on each grant application. She was also responsible for conducting site reviews of the applicants, processing appeals of grant denials, and selecting members of the Study Section.

Dr. Asher Hyatt, Chief of the Biomedical Sciences Review Section, was Dr. Johnson's supervisor. Plaintiff alleges that in 1984, Dr. Hyatt made "sexual advances" toward her and treated her in a manner that constitutes sexual harassment. In addition, plaintiff claims that various actions of her supervisors violated the Rehabilitation Act, in that they failed to accommodate her for her "handicap" and treated her in a discriminatory fashion because of her handicap.

She contends that her supervisors failed to make reasonable accommodations for her medical conditions and discriminated against her in the manner in which they handled her requests for leave for medical appointments, sick leave, and leave without pay. She also claims that they failed to make accommodations for her narcolepsy because they did not grant her request for flexible starting and ending times at work and two breaks during the day for short naps. Dr. Johnson resided in Annapolis, Maryland and commuted by car to NIH in Bethesda, Maryland. Because of her narcolepsy, at times she apparently became too sleepy to drive.

On August 22, 1985, Dr. Johnson, in a memorandum to Dr. Hyatt, requested flexible starting and ending times so that she could pull over to nap if she became sleepy while driving. She also asked that she be allowed to change her regularly scheduled working hours at times other than on the officially permitted dates of July 1 and December 1 "so as to take advantage of seasonal traffic patterns and minimize total work hours." (Paper No. 51, Ex. 1, attached Ex. 6).

On August 27, 1985, in a reply memorandum, Dr. Hyatt stated that he had "consulted with the DRG Personnel Office" and learned that "[a]ccommodation consideration for your handicap condition requires that you provide appropriate medical supporting documentation." (Paper No. 51, Ex. 1, attached Ex. 7). He asked that Dr. Johnson's physician submit documentation that addressed several specific questions. The memo went on to say:

> Also note that the medical supporting information may be used as documentation in a disability retirement action. Disability retirement may be *offered* if accommodation cannot be reached.

Plaintiff's Ex. 7 (emphasis in original).

On September 6, 1985, Dr. Johnson sent a memorandum to Dr. Hyatt in which she indicated that they had had "ongoing discussions since March about my request for changing duty hours from 8:30 to 5 to 7:30 to 4:00 p.m." and that during previous discussions Dr. Hyatt had suggested that the request be handled informally rather than through the personnel office. (Paper No. 51, Ex. 1, attached Ex. 8). She noted that her request was not unusual and was surprised at the extensive documentation requested but that she would be "more than willing to provide a letter from my physician if necessary." (*Id.*). On October 1, 1985, Dr. Johnson sent Dr. Hyatt a memorandum describing her handicaps and attached a letter from her physician, Dr. Goldstein, describing her narcolepsy, heart condition, and breast cancer. Dr. Goldstein made the following recommendations:

> [S]he will need to have a flexible working hour schedule with due regard given to possible late arrival and late departure. Fortunately her condition is such that she can predict when attacks are about to occur and she is able to take short naps to regain a normal state of consciousness. She is never expected to obtain full or partial recovery and will always be hampered by this condition. If the patient were given a regular work schedule wherein she could participate in a car pool arrangement where she would not be responsible for driving to and from work the above recommendations would not be necessary. However, I understand that she needs to work late at

times to attend meetings associated with her current job situation.

Paper No. 51, Ex. 1, attached Ex. 9.

Dr. Friedman, Chief of the Referral and Review Branch and Dr. Johnson's second level supervisor, reviewed Dr. Johnson's request and informed Dr. Hyatt that DRG policy permitted Dr. Hyatt to grant 15 minutes of flexibility in start and stop time, but that flexitime greater than 15 minutes had to be approved by Dr. Friedman. (Paper No. 51, Ex. 2, at 70). Neither Dr. Hyatt nor Dr. Friedman informed Dr. Johnson that 15 minutes flexibility was permitted. (*Id.* at 258–289, and Paper No. 51, Ex. 3, at 117.) However, Dr. Hyatt stated in his deposition that Dr. Johnson was aware of this policy. Both Dr. Hyatt and Dr. Friedman acknowledged that they never considered granting plaintiff flexible starting and ending times in excess of 15 minutes because it was not DRG policy.

On October 7, 1985, Dr. John D. Robertson, the Personnel Officer, sent plaintiff's request and documentation to the Assistant Director of the Occupational Medical Services ("OMS") at NIH. In his cover memorandum, Dr. Robertson noted that the plaintiff was being permitted to change her tour of duty four times a year rather than the normal twice a year. (Paper No. 53, Ex. 28). On October 30, 1985, plaintiff sent a memorandum to Dr. Hyatt, in which she advised him that Dr. Robertson had given her a copy of his memo to OMS. She indicated that being able to change her hours four times a year was helpful but that she disagreed with Dr. Robertson's perception that she rarely scheduled meetings outside of her regular hours. She stated that having a car pool would only be "partially satisfactory for a person with my responsibility as I go directly to other locations in order to perform my duties as an executive secretary." (Paper No. 53, Ex. 29).

The OMS assigned the evaluation of plaintiff's request to Dr. Thomas Lawford, an OMS physician. Dr. Lawford spoke with Dr. Johnson and her physician. On November 29, 1985, he wrote a report concurring with plaintiff's physician that plain-

tiff suffered from a form of narcolepsy. He noted that her "condition causes her to fall asleep while driving," and that she has to pull over and sleep for about 15 minutes, often more than once during her hour long drive from Annapolis. Dr. Robertson went on to say:

Thus, her physicians advise us, there are legitimate medical reasons for there being considerable variation in her travel time, both to and from work—*if she drives herself.*

3. She will continue to experience a variable number of short (15 minute) naps during the day ...

4. While any employer will need to accommodate for her variability in driving time to (and from) work, an even more desirable accommodation is for the employer to make adjustments in working hours that will permit her to seek and successfully find a car pool.

This is for the safety of Dr. Johnson and the safety of other drivers.

Specifically it means arranging her duties such that they can all be confined to a set of regular, predictable starting and stopping times. This is a sine qua non for her being able to use a car pool.

Paper No. 53, Ex. 33.

On December 12, 1985, Dr. Robertson provided a copy of Dr. Lawford's recommendations to Dr. Hyatt. (Paper No. 53, Ex. 34). On December 13, 1985, Dr. Hyatt sent the plaintiff a note saying: "The only further accommodation I can make is to the hours of a car-pool. I strongly suggest you try to find an appropriate car-pool. There is a locator in Bldg. 31 (496–6851)." (Paper No. 53, Ex. 35). Dr. Hyatt admitted that to his knowledge no one in DRG adjusted plaintiff's work hours. (Paper No. 51, Ex. 2 at 488.)

Dr. Johnson joined a car pool soon after she received Dr. Hyatt's memorandum. She testified in a deposition that this arrangement was unsatisfactory because it increased the amount of time she spent driving. She had to drive 25 to 30 minutes to meet the car pool members and then they would take turns driving. Also, Dr. Johnson states that because her working

hours had not been regularized, on some days she was unable to participate in the car pool. Plaintiff testified that she did not tell the car pool members about her narcolepsy and was fighting off sleep on the days when she had to drive the car pool. Apparently, plaintiff never asked the members of her car pool whether she could pay money instead of driving. Plaintiff continued to car pool until she left her position.

On April 7, 1986, Dr. Johnson requested five weeks of Leave Without Pay ("LWOP") beginning April 9, 1986. In support of her request, she attached a letter from her clinical psychologist, who stated that she had advised Dr. Johnson to take at least a month's leave from work as she was suffering from "extreme physical and psychological exhaustion." (Paper No. 51, Ex. 1, attached Ex. 15). The psychologist explained that "extremely long commuting time because of her motor pool participation, and increased workload and other demands are causing her stress level to become a matter of concern." *Id.* On April 8, 1986, Dr. Friedman approved the leave on the condition that leave would not begin until Dr. Johnson gave written assurance to her supervisor that *"everything* needed to complete the summary statements for the last study section round has been completed" and provided a "report of the status of applications pending review of the next round." (Paper No. 51, Ex. 1, attached Ex. 16). Plaintiff alleges that Dr. Hyatt subsequently gave her more applications to review, which required her to perform additional work.

On April 11, 1986, Dr. Johnson requested 52 hours of advance sick leave for routine medical examinations. Dr. Hyatt approved 29 hours of the leave, which he claimed was the amount of sick leave that Dr. Johnson had already used up. Dr. Hyatt also directed, through a memorandum, that any additional sick leave had to be requested and approved in advance in writing. Dr. Johnson received this memorandum no earlier than April 16, 1986.

On April 14 and April 15, 1986, Dr. Johnson attended a professional conference in New York. She claims that she notified Dr. Hyatt of the conference in advance and that he indicated no opposition. When Dr. Johnson submitted a slip requesting administrative leave for the two-day conference, Dr. Hyatt denied the request stating that prior approval had not been obtained.

On April 16, 1986, Dr. Johnson spent two hours in the morning at a hospital for an evaluation related to her breast cancer. When she returned to work, she submitted a slip for two hours of sick leave. Dr. Hyatt denied this request on the ground that it had not been approved in advance.

On April 17, 1986, Dr. Hyatt sent a memorandum to Dr. Johnson which stated that Dr. Johnson would be granted no further sick leave until her sick leave balance reached zero, and that no leave of any kind would be granted unless leave was sought in writing three days in advance.

On April 17, 1986, Dr. Johnson completed a handwritten memorandum to Dr. Friedman, describing the status of her work. On April 18, 1986, Dr. Johnson tried to give the memorandum to Dr. Friedman. Dr. Friedman said he would not accept a handwritten memorandum and handed Dr. Johnson a memorandum, dated April 17, 1986, in which he demanded to know why he had not received the status memorandum. On April 18, 1986, presumably later in the day, Dr. Johnson provided Dr. Friedman with a typed copy of her status memorandum. Dr. Hyatt reviewed the status memorandum and confirmed to Dr. Friedman that Dr. Johnson's work was "essentially complete."

Dr. Johnson was apparently still not released on Leave Without Pay. She requested her attorney to call Mr. Pike and ask that LWOP be granted. On April 21, 1986, Dr. Johnson provided Mr. Pike a letter from Dr. Thomas Goldman, who had interviewed Dr. Johnson the previous day and confirmed that Dr. Johnson was suffering from stress and required a leave of absence. On April 21, 1986, Dr. Johnson filed an EEO complaint, alleging that DRG had failed to accommodate her handicap, refused to grant her LWOP, and discriminated against her on the basis of her sex and handicap. Later on April 21, 1986,

after talking with Dr. Johnson and her attorney, Mr. Pike granted Dr. Johnson LWOP starting on April 22, 1986.

On May 16, 1986, Dr. John Robertson, DRG Personnel Officer, wrote to Dr. Wasserman, OMS Medical Director, asking her to determine whether OMS would support disability retirement for Dr. Johnson. On June 4, 1986, Mr. Robertson, Dr. Wasserman, Mr. Pike, Dr. Green, and Dr. Strauss, an OMS psychiatrist, met to discuss Dr. Johnson's leave status and the possibility of disability retirement. Later on June 4, 1986, Dr. Johnson submitted an application for disability retirement to the DRG personnel office. On June 5, 1986, Dr. Hyatt drafted an evaluation of Dr. Johnson, backdated to April 1, 1986, which stated that her performance was unsatisfactory. Dr. Hyatt admitted that this review was not a true judgment of her performance but intended to enable her to receive disability retirement.

Plaintiff states that on June 6, 1986, Mr. Pike wrote a letter to Dr. Johnson directing her to undergo a psychiatric evaluation, under threat of termination of her employment. Defendant states that Mr. Pike did not order but suggested an evaluation. Dr. Johnson protested the evaluation and found out from the Office of Personnel Management that such an order was illegal. However, Dr. Johnson went for two psychiatric evaluations conducted by Dr. Strauss, an OMS physician, on July 17 and July 24, 1986. Dr. Johnson states that during these evaluations, she was first told of Dr. Hyatt's unsatisfactory reviews of her performance.

On August 5, 1986, Dr. Johnson spoke to Dr. Green to discuss the possibility of reassignment to another position not under Dr. Hyatt's supervision. Dr. Johnson states that Dr. Green insisted that retirement was the only option. Defendant states that on August 5, 1986, Mr. Hadley, a DRG personnel manager, certified that plaintiff had been contacted and was unwilling to accept a position at a lower grade, GS–13, at her present salary. Plaintiff disputes this and claims she was never offered the same salary.

On August 20, 1986, Dr. Johnson submitted her resignation, in which she wrote:

For health and personal reasons. Have filed OPM retirement form 150 June 4, 1986. Existing medical conditions exacerbated by job stress related to:

(1) Refusal of supervisor to reasonably accommodate a medically documented handicap.

(2) Personally directed threats and verbal abuse; harassment on medical leave.

(3) Frequent, abrupt, and erratic changes in instruction and policy interpretation from supervisor, leading to stressful and confusing situations. Supervisor frequently has no memory of previous instructions.

(4) Supervisor attempted to limit job-related personal contacts by requiring his clearance on contacts with other professionals and with the Personnel Office, leading to stressful working conditions.

Paper No. 53, Ex. 77. Later that same day, plaintiff sent a letter in which she stated:

Enclosed is a revised resignation action on Form 50. Please substitute this for the longer version I very recently sent. Also enclosed is a resignation letter.

Paper No. 53, Ex. 79. The revised version of the form stated:

For health and personal reasons relating to job stress which exacerbated existing medical condition. Have filed OPM Form 1503 for retirement.

Paper No. 53, Ex. 80.

On April 14, 1987, plaintiff was notified by OPM that her application for disability benefits had been denied. Plaintiff filed a request for reconsideration, and through her attorney, requested DRG officials to supply further documentation in support of her application for disability retirement. Dr. Hyatt and Mr. Hadley provided further statements. Subsequently, on February 3, 1988, OPM reconsidered its previous decision and granted plaintiff retirement benefits retroactive to April 22, 1986.

On April 8, 1990, the plaintiff was reinstated to a position with defendant, as a Health Science Administrator, GS–13, step

6, at an annual salary of $49,701. She is currently employed by the U.S. Department of Health and Human Services, Food and Drug Administration.

## SEXUAL HARASSMENT CLAIM

Plaintiff has brought a claim of sex discrimination under Title VII based on the theory that sexual harassment created a hostile environment in the workplace and also that her employer retaliated against her for not giving in to his sexual demands. Defendant has moved for summary judgment on the sexual harassment claim.

Plaintiff asserts the following facts in support of her sexual harassment claim. She states that soon after she started working at DRG, Dr. Hyatt kissed her and said, "I have got to kiss you." She also says that she learned through colleagues at DRG that Dr. Hyatt had a reputation for having affairs with and sexually harassing women under his supervision. Dr. Johnson states that on several occasions from August 1984 through May, 1985, Dr. Hyatt "demanded that she have lunch with him, sit with him in the lunchroom, or visit him in his office to discuss 'global issues.'" (Paper No. 67, at p. 8). She further states that on at least four occasions between July and August, 1984 Dr. Hyatt placed his hands on Dr. Johnson's shoulders and back, which was unwelcome and offensive to her. Dr. Johnson states that on various occasions Dr. Hyatt was unduly critical of her work and complained about her "body language." Dr. Johnson alleges that on April 12, 1985, at the end of an evaluation meeting, Dr. Hyatt embraced her. Dr. Hyatt often called Dr. Johnson "Luv." Plaintiff contends that Dr. Hyatt conditioned Dr. Johnson's continued employment on sexual favors, and because plaintiff did not submit, Dr. Hyatt retaliated against her by giving her poor reviews, failing to accommodate her for her handicaps, and denying her requests for leave.

■ Defendant argues that plaintiff's action is time-barred. Under Title VII, federal employees must speak to an EEO Counselor within thirty days of the alleged discriminatory action. 29 C.F.R. § 1613–214(a)(1). Federal employees must seek administrative review of their complaint before filing a suit for employment discrimination. *See* 42 U.S.C. § 2000e–16(b) and (c). The Fourth Circuit has ruled that failure to contact an EEO Counselor within thirty days is not an absolute bar to a court's subject matter jurisdiction, but will generally result in dismissal for failure to exhaust administrative remedies. *Zografov v. V.A. Medical Center,* 779 F.2d 967 (4th Cir.1985). However, the court may entertain the suit if the plaintiff can, at the very least, show affirmative misconduct on the part of the government such that it should be estopped from raising the defense of a thirty-day limit. *Id.* at 969. In the instant case, plaintiff did not contact an EEO Counselor until April 21, 1986. Defendant argues that plaintiff's claim is time-barred because plaintiff fails to assert any allegation of harassment which occurred within thirty days before she contacted the EEO Counselor. However, plaintiff's claim is that the sexually hostile environment continued throughout her employment and that her supervisor's denial of requests for accommodation and leave were a part of the harassment. Thus, under the theory of "continuing violation" plaintiff's claim is timely since she does allege conduct that occurred within the thirty day period which could be considered part of a continuing practice of harassment. Under the doctrine of "continuing violation," an action is timely filed with respect to any act of the defendant if the act is part of an ongoing pattern of discrimination which continues into the limitations period. *Held v. Gulf Oil Co.,* 684 F.2d 427, 430 (6th Cir.1982). Accordingly, the claim under Title VII is timely.

■ Defendant moves for summary judgment on the sexual harassment claim on the grounds that plaintiff has failed to make out a *prima facie* case under Title VII, and that even if she had made out a *prima facie* case, defendant has rebutted plaintiff's case by presenting legitimate reasons for its actions. The Court agrees with plaintiff that defendant has articulated an incorrect legal standard for the sexual harassment claim. The standard set

forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is inapposite in a sexual harassment case. In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that sexual harassment violates Title VII if it creates a "hostile work environment" or when it takes the form of *"quid pro quo." Id.* at 65–67, 106 S.Ct. at 2404–2405. Plaintiff proceeds under both theories by alleging that sexual harassment created a "hostile environment" at work and that the employer conditioned the terms of employment on plaintiff's submission to sexual advances. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405. In the instant case, the facts alleged by plaintiff make out a *prima facie* case of sexual harassment under both the "hostile environment" and *quid pro quo* theories. A *prima facie* case of sexual harassment creating a "hostile environment" cannot be rebutted by a "legitimate" reason. The trier of fact must consider the "totality of circumstances" and the "record as a whole" in determining whether sexual harassment took place. *Id.* at 69, 106 S.Ct. at 2406–07. As the moving party, defendant has failed to show that there is no genuine dispute as to whether plaintiff was subjected to sexual harassment. Thus, summary judgment is not warranted as to the "hostile environment" claim. In a *quid pro quo* claim, defendant can rebut a *prima facie* case by showing, through clear and convincing evidence, that there was a legitimate nondiscriminatory reason for the employment action. *Bundy v. Jackson*, 641 F.2d 934, 953 (D.C.Cir.1981). Defendant has set forth some reasons for its denial of accommodations and leave time. However, defendant fails to meet its burden by clear and convincing evidence. Because a genuine issue of material fact remains, summary judgment cannot be granted for defendant on the *quid pro quo* sexual harassment claim.

## HANDICAP DISCRIMINATION CLAIM

Plaintiff has brought a claim of discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., which prohibits employers from discriminating against otherwise qualified handicapped individuals. Plaintiff brings her claim under Section 504 of the Rehabilitation Act, but defendant argues that since plaintiff is a federal employee, the applicable provision is Section 501. The 1978 amendments to the Act provide that § 504 also covers "any program or activity conducted by an Executive agency or by the United States Postal Services." 29 U.S.C. § 794. Thus plaintiff could bring a claim under either § 504 or § 501. The parties have filed cross-motions for summary judgment on the handicap discrimination claim.

■ The Court will initially resolve several questions of jurisdiction raised by defendant. First, the Court finds that plaintiff's action is not untimely since she contacted an EEO Counselor on April 21, 1986, within thirty days of the last alleged discriminatory act. Among other allegations, plaintiff contends that her supervisor's denial of sick leave in April, 1986 and the conditions placed on her before she was permitted to take Leave Without Pay in April, 1986 constituted violations of the Rehabilitation Act. Defendant argues that plaintiff should have contacted the EEO Counselor within thirty days of the denial of flexible hours. However, the denial of flexible hours and the actions of defendant regarding plaintiff's requests for leave could be considered to be a series of acts that form a "continuing violation." Under the continuing violation doctrine, a plaintiff's action is timely filed if she can show a series of related acts, one or more of which are within the thirty day limitations period. *Valentino v. U.S. Postal Service*, 674 F.2d 56, 65 (D.C.Cir.1982). The Fourth Circuit has stated that "[i]t is *only* when an actual violation has occurred within that requisite time period ... that under any possible circumstances the theory of continuing violation is sustainable." *Hill v. A.T. & T. Technologies, Inc.*, 731 F.2d 175, 180 (4th Cir.1984) (quoting *Woodard v. Lehman*,

717 F.2d 909, 915 (4th Cir.1983)). In the instant case, the Court, without making any determination as to the merits of her claim, feels that plaintiff has alleged actions by her employer that occurred within thirty days of her consulting the EEO Counselor which could be considered part of an ongoing pattern of discrimination. Therefore, plaintiff's action is timely filed as to all the conduct that she argues constitutes evidence of discrimination under the Rehabilitation Act.

■ Defendant argues that plaintiff's claims under Title VII and the Rehabilitation Act are barred because she filed for and received worker's compensation benefits under the Federal Employees' Compensation Act ("FECA"). 5 U.S.C. §§ 8101–8193. Plaintiff was awarded FECA benefits for work related stress injury for the dates April 22, 1986 to August 27, 1986. This Court is aware of no law that precludes a FECA beneficiary from recovering for discrimination under Title VII or the Rehabilitation Act. The Third Circuit, in *Miller v. Bolger*, 802 F.2d 660 (3rd Cir. 1986), has held that FECA recovery for injuries does not preclude claims for at least some Title VII recoveries. In that case, the court compared the statutory frameworks of Title VII and FECA and concluded that while FECA is an exclusive source of damages for workplace injury, Title VII remedies are considered "equitable make-whole relief to redress discrimination." *Id.* at 663. The court concluded:

> The legislative histories of FECA and Title VII make clear that the statutes create separate remedies against the United States for distinct types of injuries. The statutory language of FECA does not preclude a federal employee from pursuing Title VII remedies for discrimination, and we find no evidence that Congress intended to do so.

*Id.* at 667. The same analysis applies to the Rehabilitation Act, a civil rights statute

patterned after Section 601 of Title VI of the Civil Rights Act of 1964. The remedies and procedures under Title VI apply to violations of Section 504 of the Rehabilitation Act.[2] In interpreting the Rehabilitation Act, courts have looked to both Title VI and Title VII of the Civil Rights Act of 1964. *See Smith v. Barton,* 914 F.2d 1330 (9th Cir.1990). It is noteworthy that under FECA, an employee can only recover any pay for the period after the date the disability began, while under Title VII and the Rehabilitation Act back pay may be available for discrimination prior to the period of disability. In addition, FECA only pays a percentage of the back pay. *See* 5 U.S.C. §§ 8105, 8110. Moreover unlike FECA, under Title VII and the Rehabilitation Act reinstatement and attorney's fees are available. Thus, this Court finds that FECA was not intended to prevent claims under Federal anti-discrimination statutes. Accordingly, plaintiff's claims under the Rehabilitation Act and Title VII are not barred by the fact that she received FECA benefits. However, the Court may take into account any compensation plaintiff receives under other statutes in deciding what relief, if any, plaintiff is entitled to.

■ Defendant also argues that this Court is "without jurisdiction to review the Office of Personnel Management's Decision that the plaintiff was disabled." (Paper No. 53, at p. 71). 5 U.S.C. § 8347 states in pertinent part:

> (c) The Office shall determine questions of disability and dependency arising under this subchapter. Except to the extent provided under subsection (d) of this section, the decisions of the Office concerning these matters are final and conclusive and not subject to review....

5 U.S.C. § 8347.

In the instant case, plaintiff does not seek review of OPM's decision to grant her disability retirement. Rather, she seeks relief under the Rehabilitation Act, com-

---

**2.** Section 505(a)(1) of the amended Rehabilitation Act, 29 U.S.C. § 794a(a)(1) (1985) provides: The remedies, procedure, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.] shall be available to

any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

plaining that she was not reasonably accommodated for her handicaps and was discriminated against because of her handicaps. In *Rosenfeld v. Department of Army*, 769 F.2d 237 (4th Cir.1985), a similar question was presented. Rosenfeld had been involuntarily retired from the Army on the basis of mental disability. He later brought an action under the Age Discrimination in Employment Act complaining that he had been retired because of his age. The Court of Appeals reversed the district court's ruling that 5 U.S.C. § 8347 precluded judicial review of the administrative finding of mental disability. The Fourth Circuit's ruling is instructive for the case at bar:

> Federal anti-discrimination statutes embody a strong presumption in favor of judicial resolution of disputed questions of fact. Prior administrative findings, whatever result may be reached, are ordinarily not entitled to preclusive effect in a subsequent discrimination suit, even though the same facts are in dispute. Whether the prior administrative findings be those of the Civil Service Commission, the EEOC, or any other federal agency is immaterial. The plain lesson of *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), and *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), is that Congress entrusted the ultimate resolution of questions of discrimination to the federal judiciary.

*Id.* at 239.

Defendant argues that *Rosenfeld* is inapplicable here because the plaintiff in that case did not have an opportunity to contest the employer's decision to seek disability retirement. However, the Fourth Circuit's decision in *Rosenfeld* was not predicated on this fact. Rather, the Court focused on the legislative policy behind anti-discrimination statutes. The Court concluded:

> In sum, we can find no indication that Congress intended § 8347(c) to have collateral estoppel consequences in employment discrimination actions, or considered this statute an exception to the strong presumption favoring *de novo* judicial resolution of controverted factual matters under Title VII and the ADEA. *Id.* at 243.

This Court agrees that the policy favoring independent judicial determinations in discrimination cases gives this Court jurisdiction to make findings of fact about the allegations underlying plaintiff's Rehabilitation Act claims. Moreover, the Court notes that OPM's finding that Dr. Johnson was disabled was apparently based on documents prepared for the purpose of enabling plaintiff to receive disability and may not have reflected her actual performance.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The parties have filed cross-motions for summary judgment on the handicap discrimination claim. Where cross-motions for summary judgment have been filed, "[t]he court must rule on each party's motion on an individual and separate basis, determining, in each case whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Management Corp. v. Hartford Acc. and Indem. Co.*, 627 F.Supp. 170, 172 (D.Md.1985) (quoting Wright, Miller, & Kane, *Federal Practice & Procedure: Civil* 2d § 2720).

Plaintiff has moved for partial summary judgment on her claim of discrimination under the Rehabilitation Act. A party moving for summary judgment must show that no genuine issue of material fact exists, and that she is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). Furthermore, "there should be 'no disagreement as to the inferences which may be drawn from the undisputed facts.'" *Towne Management, supra*, at 172 (quoting *Steinberg v. Elkins*, 470 F.Supp. 1024, 1030 (D.Md.1979). The moving party bears the burden of showing the absence of genuine dispute as to any material fact, and any doubts will be resolved against the movant. *Id.*

■ In a Rehabilitation Act claim, the plaintiff must prove that she is "handicapped" within the meaning of the Act, that she was otherwise qualified for the job in question, and was discriminated against

because of her handicap by an employer which receives federal funding. 29 U.S.C. § 794. Section 706(7)(B) of Title 29, U.S.C., defines "handicapped individual" as:

[A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment.

29 U.S.C. § 706(7)(B). The Department of Labor regulations explain that "life activities" may be considered to include, among other activities, vocational training, employment, transportation. 41 C.F.R. § 60.741, appendix A (1987). This Court believes that the combination of plaintiff's heart disease, hypersomnolence or narcolepsy, and stress disorder render her "handicapped" under the Rehabilitation Act. Cardiovascular disease has been found to be a handicap under the Rehabilitation Act. *See e.g., Bento v. I.T.O. Corp. of Rhode Island*, 599 F.Supp. 731, 741 (D.R.I.1984). Also, narcolepsy was considered a handicap under the Act in *Ross v. Beaumont Hospital*, 687 F.Supp. 1115 (E.D.Mich.1988). In the instant case, the combination of heart disease and hypersomnolence prevented plaintiff from taking stimulants to prevent sleepiness. Moreover, stress apparently exacerbated plaintiff's narcolepsy. As a result, her condition substantially impaired "major life activities" such as employment and transportation. Therefore, plaintiff's conditions render her "handicapped" within the Rehabilitation Act.

■ Plaintiff must also show that she is "otherwise qualified" for the job in question, by establishing that in spite of her handicap, she was qualified for the job or would be qualified for the job with reasonable accommodation. *Southeastern Community College v. Davis*, 442 U.S. 397, 403–407, 99 S.Ct. 2361, 2365–68, 60 L.Ed.2d 980 (1979). The EEOC regulations state that:

"Qualified handicapped person" means with respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others …

29 C.F.R. § 1613.702(f). Defendant contends that "a very real question exists whether plaintiff would be considered an otherwise qualified handicapped individual under the Rehabilitation Act." (Paper No. 53, at p. 67). Defendant submits that because of plaintiff's narcolepsy and stress condition, she could not be alert during meetings which are required for her job. However, according to plaintiff's job evaluations and her supervisor's testimony, plaintiff's performance was "fully satisfactory" up to April 1, 1986. Apparently plaintiff was able to meet the basic requirements of her job. Accordingly, this Court finds that plaintiff has shown that she was an "otherwise qualified handicapped individual" under the Rehabilitation Act.

■ A federal employer has an obligation to provide reasonable accommodation for the handicapped, as long as the accommodation would not impose "undue hardship" on the employer. *Carter v. Bennett*, 651 F.Supp. 1299, 1300 (D.D.C.1987); *aff'd* 840 F.2d 63 (D.C.Cir.1988); *Prewitt v. United States Postal Service*, 662 F.2d 292, 308 (5th Cir.1981); 29 C.F.R. § 1613.704. The employer bears the burden of persuading the Court that it provided reasonable accommodation or that it was unable to accommodate plaintiff. *Carter v. Bennett*, 651 F.Supp. at 1300. However, once the employer puts forth credible evidence of reasonable accommodation or inability to accommodate, plaintiff has the burden of providing evidence regarding possible accommodation to rebut the employer's evidence. *Id.*

■ On a motion for summary judgment, the Court's function is to determine whether there is a genuine issue for trial. "[T]here is no issue for trial unless there is sufficient evidence for the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In the instant case, upon review of the materials presented by the defendant, this Court believes that de-

fendant has provided sufficient evidence such that a jury could return a verdict for the defendant on the Rehabilitation Act claim. Defendant has shown that plaintiff's doctor suggested that a car pool may be appropriate accommodation, and that plaintiff's supervisor subsequently suggested that plaintiff join a car pool. Moreover, with regard to plaintiff's claims regarding her requests for leave, defendant has put forth sufficient evidence such that a jury could find that defendant did not discriminate against defendant. As the moving party, plaintiff has not put forth sufficient evidence to rebut defendant's showing that there is a genuine dispute. In ruling on plaintiff's motion for summary judgment, this Court must consider the evidence and the inferences drawn from them in the light most favorable to defendant, the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–9, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Because there is a genuine dispute as to whether defendant reasonably accommodated plaintiff's handicap, this Court cannot grant summary judgment for plaintiff.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

 Defendant has moved for summary judgment on the claim of discrimination under the Rehabilitation Act. The Court has already determined that plaintiff is "handicapped" and "otherwise qualified" under the Rehabilitation Act. However, defendant could still be granted summary judgment if defendant showed that there is no genuine dispute that it provided "reasonable accommodation" for plaintiff's handicap. Defendant states that the agency followed the physicians' advice and gave plaintiff a regular schedule and suggested she join a car pool. Plaintiff claims that she was not given a regular schedule and thus the car pool was not adequate accommodation. With regard to plaintiff's requests for advance sick leave, and leave without pay, there is no dispute as to what transpired. However, there is a dispute as to whether plaintiff was treated differently from other employees who asked for sim-

ilar types of leave. Moreover, there is a question as to whether the employer's handling of the requests for leave constituted "reasonable accommodation." Furthermore, plaintiff has also made other allegations of discrimination which have not been adequately rebutted by the defendant, including that she was asked by her employer to submit to a psychiatric evaluation. In moving for summary judgment, defendant has the burden of showing that there is no genuine dispute as to whether defendant reasonably accommodated plaintiff. Because the defendant in a Rehabilitation Act claim has the burden of persuasion that it reasonably accommodated plaintiff, defendant's burden on summary judgment is strong in this case. Looking at the evidence in the light most favorable to plaintiff, the non-moving party, as required under *Anderson v. Liberty Lobby, supra,* the Court believes that there is a genuine issue of fact as to whether plaintiff was reasonably accommodated. Thus, under the Fourth Circuit's standard for summary judgment, defendant's motion for summary judgment on the Rehabilitation Act claim will be denied. Defendant also argues that the Court is not authorized to award compensatory damages because under the Rehabilitation Act, "only relief which is equitable in nature is authorized." (Paper No. 53, at p. 70). In the instant case, plaintiff seeks reinstatement, back pay, front pay and "compensatory damages." The Supreme Court has not determined "the extent to which money damages are available under Sec. 504." *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 630, 104 S.Ct. 1248, 1252, 79 L.Ed.2d 568 (1984). However, the Supreme Court did authorize the award of back pay under the Rehabilitation Act as an equitable remedy. *Id.* The Fourth Circuit has not ruled on the availability of compensatory damages beyond back pay under the Rehabilitation Act, and other courts are divided on this issue. This Court sees no reason for deciding at this time whether compensatory damages are available under the Rehabilitation Act. The Court will decide this issue, if needed, after trial.

## CONSTRUCTIVE DISCHARGE CLAIM

Defendant has also moved for summary judgment on plaintiff's claim that she was constructively discharged from her employment. The Court of Appeals for the Fourth Circuit has ruled:

> A constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) [citations omitted]. A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions.

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985) *cert. denied Bristow v. Daily Press, Inc.*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). Deliberateness exists only if the employer intended to force the employee to leave. *Id.* Intent may "be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions." *Id.* Whether the working conditions were "intolerable" must be assessed "by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Id.* Plaintiff alleges that she was subjected to sexual harassment, that she was not reasonably accommodated for her handicaps, that she was not allowed reasonable leave to accommodate her handicaps and cope with stress reaction caused by the employer's conduct, and that defendant pressured her to file for disability retirement. Defendant argues that a reasonable person would not have felt compelled to resign while an application for disability retirement was pending. Considering the evidence in the light most favorable to plaintiff, the non-moving party, the Court concludes that whether Dr. Johnson was constructively discharged by defendant is a disputed issue of fact, not resolvable on a motion for summary judgment.

## CONCLUSION

For the foregoing reasons, it is this 8th day of February, 1991, by the United States District Court for the District of Maryland,

ORDERED:

(1) that plaintiff's Motion to Strike Exhibits 10, 11, 12, 14, 17, 18, 19, 21, 26, 30, 31, 39, 48, 51, 52, 53, 54, 55, 57, 59, 62, 63, 66, 74, 75, 81, 83, 84, 85, 88, 89, 90, 91, 92, and 95 be, and the same hereby is, *Granted;*

(2) that plaintiff's Motion to Strike Six Pages of Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment be, and the same hereby is, *Denied;*

(3) that plaintiff's Motion for Partial Summary Judgment be, and the same hereby is, *Denied;* and

(4) that defendant's Motion for Summary Judgment be, and the same hereby is, *Denied as to all causes of action.*